## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JASON GOLDSTEIN, on behalf of himself and all others similarly situated, | Case No.  9:21-cv-82111 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| HENKEL CORPORATION and THRIVING BRANDS LLC, | |
| Defendants. | |

Plaintiff Jason Goldstein ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Henkel Corporation ("Henkel") and Thriving Brands LLC ("Thriving Brands") (collectively, "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.      This is a class action lawsuit regarding Defendants' manufacturing, distribution, and sale of Right Guard antiperspirant aerosol and spray products (the "Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      Right Guard is a brand of antiperspirants.  Between 2006 and June 2021, Right Guard was manufactured, distributed, and sold by Defendant Henkel.  In June 2021, Henkel sold

the Right Guard brand to Defendant Thriving Brands,[1] who has since manufactured, distributed, and sold the Products.

3.     The Products discussed herein contain benzene, a carcinogenic chemical impurity that has been linked to leukemia and other cancers.  The Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured by Defendants.  The presence of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law.  As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless.  *See* 21 U.S.C. §§ 331(a), 352; *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

4.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[2]  A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not

---

[1] David Seely, *Dallas' Trive Capital Forms Thriving Brands, Acquires Right Guard and Dry Idea From Germany's Henkel*, DALLAS INNOVATES, Aug. 24, 2021, https://dallasinnovates.com/dallas-trive-capital-forms-thriving-brands-acquires-right-guard-and-dry-idea-from-germanys-henkel/.

[2] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

safe,"[3]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[4]

5.      According to the American Cancer Society:

IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

6.      Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[6]

7.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[7]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

---

[3] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54 (https://www.cabdirect.org/cabdirect/abstract/19402700388)

[4] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148 (https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646)

[5] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[6] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[7] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

8.      On November 3, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[8]

9.      Valisure tested the Right Guard Products manufactured by Defendants, which were found to contain as much as 5.00 parts per million of benzene[9]:

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Right Guard | 017000068060 | Q405410200 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 5.00 |
| Right Guard | 017000068060 | Q610900732 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 2.61 |
| Right Guard | 017000068268 | Q601900730 | Unknown | Sport, Powder Dry, Up To 48 HR Odor Protection | 1.46 |
| Right Guard | 017000068060 | Q631800729 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 0.91 |

---

[8] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, Nov. 3, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (the "Valisure Petition"), at 1.

[9] *Id.* at 12-14.

10. The FDA does state that if the use of benzene is "**<u>unavoidable</u>** in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[10]  However, many of Defendants' Products that were tested contain levels of benzene above this amount.  Regardless, according to Valisure, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for his manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[11]  Accordingly, **<u>any</u>** level of benzene in Defendants' Products is unacceptable and therefore renders the Products adulterated, misbranded, unsafe, and worthless.

11. Defendants did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, or in any advertising or website promoting the Products.  Defendants did not disclose the presence of benzene in the Products to Plaintiff or Class members at the point of sale or at any time before the point of sale.

12. Antiperspirant body sprays are considered over-the-counter ("OTC") drugs that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.

13. As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues.  These cGMP regulations require OTC medications like the

---

[10] *Id.* at 1 (emphasis added).

[11] *Id.* at 1-2.

Products to meet safety, quality, purity, identity, and strength standards.  *See* 21 U.S.C. §

51(a)(2)(B).  Federal and state regulatory regimes require that labeling for OTC products identify

each active and inactive ingredient.[12]  21 C.F.R. 201.66 establishes labeling requirements for

OTC products and defines an inactive ingredient as "any component other than an active

ingredient."  An "active ingredient" is "any component that is intended to furnish

pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or

prevention of disease, or to affect the structure or any function of the body of humans.  **The term**

**includes those components that may undergo chemical change in the manufacture of the**

**drug product and be present in the drug product in a modified form** intended to furnish the

specified activity or effect."  (Emphasis added).

      14.     21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good

manufacturing practice for methods to be used in, and the facilities or controls to be used for, the

manufacture, processing, packing, or holding of a drug to assure that such drug meets the

requirements of the act as to safety, and has the identity and strength and meets the quality and

purity characteristics that it purports or is represented to possess."  In other words, entities at all

phases of the design, manufacture, and distribution chain are bound by these requirements.

      15.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211.  These

detailed regulations set forth minimum standards regarding: organization and personnel (Subpart

B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug

product containers and closures (Subpart E); production and process controls (Subpart F);

packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory

controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products

---

[12] https://www.fda.gov/media/72250/download.

(Subpart K).  The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

16.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States.  *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).  States have enacted laws adopting or mirroring these federal standards.

17.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess."  21 C.F.R. § 211.100.

18.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity."  21 C.F.R. § 211.160.

19.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested."  21 C.F.R. § 211.194.

20.     Defendants disregarded the cGMPs outlined above.  As a manufacturer, distributor, and seller of an OTC drug product, Defendants had and has a duty to ensure that its Products did not contain excessive (or any) levels of benzene, including through regular testing. But based on Valisure's testing results set forth above, Defendants made no reasonable effort to

test its Products for benzene or other impurities.  Nor did it disclose to Plaintiff or any other consumers in any product advertising, labeling, packaging, or marketing that its antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA.  To the contrary, Defendants represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

21.     If Defendants had not routinely disregarded the FDA's cGMPs, or had fulfilled his quality assurance obligations, Defendants would have identified the presence of the benzene contaminant almost immediately.

22.     Further, had Defendants adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

23.     Accordingly, Defendants knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

24.     Defendants also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

25.     The presence of benzene—and Defendants' failure to comply with cGMPs— renders the Products both adulterated and misbranded under the FDCA.  The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or

administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

26.     The Products are misbranded because his labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1).

27.     Under federal law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

28.     When Plaintiff purchased Defendants' Products, Plaintiff did not know, and had no reason to know, that Defendants' Products were adulterated and misbranded and thus unlawful to sell or purchase as set forth herein. Not only would Plaintiff not have purchased Defendants' Products at all had he known the Products contained benzene, he would not have been capable of purchasing them if Defendants had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities.

29.     Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendants' products).

30.     Thus, if Plaintiff and Class members had been informed that Defendants' Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

31.     Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendants have failed to warn consumers of this fact.  Such illegally sold products are worthless and have no value.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by his contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure.  Put differently, contaminated drugs, even if medically efficacious for his purpose, cannot create a benefit of the bargain because the contaminants, and his dangerous effects, were never bargained for.").

32.     Plaintiff and Class members bargained for an antiperspirant product free of contaminants and dangerous substances, and were deprived the basis of his bargain when Defendants sold them products containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

33.     Plaintiff and Class members are further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

34.     Plaintiff brings this action on behalf of himself and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*; (iv) fraud; and (v) unjust enrichment.

## PARTIES

35.     Plaintiff Jason Goldstein is a resident of Delray Beach, Florida and has an intent to remain there, and is therefore a domiciliary of Florida.  In or about July 2021, Mr. Goldstein purchased a canister of Defendants' Right Guard Sport, Fresh, Up To 48 HR Odor Protection from both a CVS and a Publix supermarket in Florida.  Mr. Goldstein has been purchasing the same Right Guard Product intermittently for the past year.  When purchasing the Right Guard Product, Mr. Goldstein reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Mr. Goldstein relied on these representations and warranties in deciding to purchase the Right Guard Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Right Guard Product from Defendants if he had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Mr. Goldstein's Right Guard Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

36.     Defendant Henkel Corporation is a Delaware corporation with its headquarters at One Henkel Way, Rocky Hill, Connecticut 06067.  Between 2006 and June 2021, Defendant Henkel distributed the Products throughout the United States and the State of Florida.  The Right Guard Products, including the adulterated Products purchased by Plaintiff and members of the putative Classes, are available at retail stores throughout Florida and the United States.

37.     Defendant Thriving Brands LLC is a limited liability company with its headquarters at 8170 Corporate Park Drive Suite 143, Cincinnati, Ohio 45242.  Since June 2021, Defendant Thriving Brands has distributed the Products throughout the United States and the State of Florida.  The Right Guard Products, including the adulterated Products purchased by Plaintiff and members of the putative Classes, are available at retail stores throughout Florida and the United States.

## JURISIDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than at least one Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

39.     Defendant Thriving Brands is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant is therefore "a citizen of the State where it has its principal place of business [Ohio] and the State under whose laws it is organized."  *See* 28 U.S.C. § 1332(d)(10).

40.     This Court has personal jurisdiction over Defendants because Plaintiff purchased the Product in this District.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because in which a substantial part of the events or omissions giving rise to the claim occurred.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class").

43.     Plaintiff also seeks to represent a subclass of all Class members who purchased the Products in Florida (the "Subclass").

44.     The Class and Subclass are collectively referred to as the "Classes."

45.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

46.     Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

47.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes are known by Defendants.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

48.     **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic

chemical impurity.  The representative Plaintiff, like all members of the Classes, has been damaged by Defendants' misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

49.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

(a)  whether the Products manufactured by Defendants contain dangerously high levels of benzene, thereby breaching the express and implied warranties made by Defendants and making the Products unfit for human use and therefore unfit for his intended purpose;

(b)  whether Defendants knew or should have known the Products contained elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

(c)  whether Defendants are liable to Plaintiff and the Classes for unjust enrichment;

(d)  whether Defendants are liable to Plaintiff and the Classes for fraud;

(e)  whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

(f)  whether Plaintiff and the Classes are entitled to declaratory and injunctive relief;

(g)  whether Plaintiff and the Classes are entitled to restitution and

disgorgement from Defendants; and

(h)   whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

50.   **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes.  Plaintiff has no interests that are antagonistic to those of the Classes.

51.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of his claims against Defendants.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

52.   In the alternative, the Classes may be certified because:

(a)   the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

15

(b)     the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede his ability to protect his interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach Of Express Warranty**

53.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-52 above as though fully set forth herein.

54.     Plaintiff brings this claim individually and behalf of the members of the proposed Classes against Defendants.

55.     In connection with the sale of the Products, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, issued written warranties by representing that the Products were antiperspirants that contained only those active and inactive ingredients listed on the Products' labels.  Those active and inactive ingredients do not include benzene, a known human carcinogen dangerous to humans.

56.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff and the Classes have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe.

57.     On November 19, 2021, prior to filing this action, Defendants were served with a

pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendants a letter advising Defendants that they breached an express warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

**COUNT II**
**Breach of Implied Warranty**

58.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-52 above as though fully set forth herein.

59.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendants.

60.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Products (i) would not contain elevated levels of benzene and (ii) are generally recognized as safe for human use.

61.     Defendants breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for his intended and ordinary purpose because the Products manufactured, distributed, and sold by Defendants were defective in that they contained elevated levels of carcinogenic and toxic benzene, and as such are not generally recognized as safe for human use. As a result, Plaintiff and members of the Classes did not receive the goods as impliedly warranted by Defendants to be merchantable.

62.     Plaintiff and members of the Classes purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

17

63.     The Products were not altered by Plaintiff or members of the Classes.

64.     The Products were defective when they left the exclusive control of Defendants.

65.     Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and members of the Classes.

66.     The Products were defectively manufactured and unfit for his intended purpose, and Plaintiff and members of the Classes did not receive the goods as warranted.

67.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene and are not generally recognized as safe for human use; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendants.

68.     On November 19, 2021, prior to filing this action, Defendants were served with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendants a letter advising Defendants that they breached an implied warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

### COUNT III
### Violation Of The Florida Deceptive And Unfair Trade Practices Act,
### Fla. Sta. §§ 501.201, *et seq.*

69.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-52 above as though fully set forth herein.

70.     Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendants.

18

71.     FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

72.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

73.     FDUPTA can be violated in two ways, both of which are relevant to this case. First, Defendants have committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiff and members of the Subclass.

74.     Second, Defendants have committed a *per se* violation of FDUPTA predicated on a violation of the FDCA.  Specifically, by selling adulterated and misbranded Products which is *per se* illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, and because the FDCA is designed to protect consumers from harmful and dangerous drugs, Defendants have committed *per se* violations of FDUPTA.  Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

75.     While FDUPTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation

marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).  Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

76.     Defendants engaged in conduct that is likely to deceive members of the public. This conduct includes representing that the Products contained only the ingredients listed in the label, which is untrue, and failing to make any mention that the Products contained harmful levels of benzene and were adulterated and misbranded.

77.     As alleged herein, Plaintiff and the Subclass have suffered injury in fact and lost money as a result of Defendants' conduct because they purchased the Products from Defendants in reliance on Defendants' representations that the Products were safe and effective and not contaminated with benzene, as well as Defendants' material omissions regarding the true nature of the Products.

78.     As alleged herein, Defendants' actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff and the Subclass to damages and relief under Fla. Stat. §§ 501.201-213.

79.     By committing the acts alleged above, Defendants engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

80.     Defendants' conduct is substantially injurious to consumers. Consumers are

purchasing and using Defendants' Products without knowledge that the Products are adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Products, which are contaminated with benzene, but for Defendants' false labeling, advertising, promotion, and material omissions. Thus, Plaintiff and the Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

81.     Indeed, no benefit to consumers or competition results from Defendants' conduct. Because consumers reasonably rely on Defendants' representation of the ingredients contained on Products' label and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

82.     Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.  Plaintiff desires to purchase Defendants' Products in the future if he can be assured that the Products are not adulterated or misbranded and meet the advertising claims on the Products' label.

## COUNT IV
### Fraud

83.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-52 above as though fully set forth herein.

84.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendants.

85.     Defendants made fraudulent misrepresentations to Plaintiff and Class members regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene.  Defendants also

21

materially omitted facts from Plaintiff and Class members, including that the Products in fact contained harmful levels of benzene.

86.     Defendants had a duty to disclose material facts to Plaintiff and the Classes given its relationship as contracting parties and intended users of the Products.  Defendants also had a duty to disclose material facts to Plaintiff and the Classes, namely that they were in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendants had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

87.     Defendants knew or should have known that the Products were contaminated with benzene, but continued to manufacture them nonetheless.  Defendants were required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products.  Had Defendants undertaken proper testing measures, they would have been aware that the Products contained dangerously high levels of benzene.  During this time, Plaintiff and members of the Classes were using the Products without knowing it contained dangerous levels of benzene.

88.     Defendants failed to discharge their duty to disclose these material facts.

89.     In so failing to disclose these material facts to Plaintiff and the Classes, Defendants intended to hide from Plaintiff and the Classes that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

90.     Plaintiff and the Classes reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendants had they known they contained unsafe levels of benzene.

91.     As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiff and the Classes suffered damages in the amount of monies paid for the defective Products.

92.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT V
## Unjust Enrichment

93.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-52 above as though fully set forth herein.

94.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendants.

95.     Plaintiff and the Classes conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective and worthless Products.

96.     Defendants voluntarily accepted and retained this benefit.

97.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendants to retain the benefit without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in his favor and against Defendants as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)     For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Classes his reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  November 19, 2021                    Respectfully Submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Sarah N. Westcot*
                    Sarah N. Westcot

Sarah N. Westcot
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com

*Attorneys for Plaintiff*