## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JASON GOLDSTEIN, BRAD DAVIS, MARIA LAZO, MOSANTHONY WILSON and JAMES CORSEY on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>HENKEL CORPORATION and THRIVING BRANDS LLC,<br><br><br>                Defendants. | Case No. 3:22-cv-00164-AWT<br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jason Goldstein, Brad Davis, Maria Lazo, Mosanthony Wilson, and James Corsey ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Henkel Corporation ("Henkel") and Thriving Brands LLC ("Thriving Brands") (collectively, "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.      This is a class action lawsuit regarding Defendants' manufacturing, distribution, and sale of Right Guard antiperspirant aerosol and spray products (the "Products") that contain benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      Between 2006 and June 2021, Right Guard was manufactured, distributed, and sold by Defendant Henkel. In June 2021, Henkel sold the Right Guard brand to Defendant Thriving Brands,[1] who has since manufactured, distributed, and sold the Products.

---

[1] David Seely, *Dallas' Trive Capital Forms Thriving Brands, Acquires Right Guard and Dry Idea From Germany's Henkel*, DALLAS INNOVATES, Aug. 24, 2021, https://dallasinnovates.com/

3.     The Right Guard brand, the second largest male deodorant brand in the United States, was first introduced in 1960.  When Thriving Brands acquired the Right Guard brand, it also acquired the brand recognition and trust of consumers that Right Guard had built over the course of its 60-year lifespan.  Defendants know that consumers reasonably believe the Right Guard brand, including the defective Products at issue, are made with quality materials and can be used safely as intended.

4.     The Products discussed herein contain benzene, a carcinogenic chemical impurity that has been linked to leukemia and other cancers.  The Products are not designed to contain benzene, and in fact, no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured by Defendants.

**The Dangers Of Benzene**

5.     Research has confirmed that there is no safe level of benzene exposure.[2]

6.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[3]  A study from 1939 on benzene stated that "exposure over a long

---

dallas-trive-capital-forms-thriving-brands-acquires-right-guard-and-dry-idea-from-germanys-henkel/.

[2] https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646[3] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[3] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

period of time to any concentration of benzene greater than zero is not safe,"[4] which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[5]

7.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[6]

8.    According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[7]

9.    Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[8]

---

[4] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54 (https://www.cabdirect.org/cabdirect/abstract/19402700388)

[5] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148 (https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646)

[6] *Facts About Benzene*, CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[7] American Cancer Society. Benzene and Cancer Risk (January 5, 2016), https://www.cancer.org/cancer/cancer-causes/benzene.html.

[8] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

10. According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[9]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

**The Valisure Report Identified High Levels of Benzene In Defendants' Products**

11. Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products, containing said harmful chemicals, from reaching consumers. Valisure is a company with a core mission "to independently check the chemical composition of medications and healthcare products before they reach consumers."[10]  In order to do this, Valisure operates an analytical laboratory registered with the FDA and accredited by the International Organization for Standardization.

12. Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine ("NDMA") in ranitidine, NDMA in metformin, benzene in hand sanitizers, and benzene in sun care products.  Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by industry and led to recalls by manufacturers over the subject products.

---

[9] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

[10] Valisure.  Valisure Detects Benzene in Body Spray Products (November 4, 2021) (https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products-3/)

13.    On November 3, 2021, Valisure "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[11]

14.    Valisure tested the Right Guard Products manufactured by Defendants, which were found to contain as much as 5.00 parts per million of benzene[12]:

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Right Guard | 017000068060 | Q405410200 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 5.00[13] |
| Right Guard | 017000068060 | Q610900732 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 2.61 |
| Right Guard | 017000068268 | Q601900730 | Unknown | Sport, Powder Dry, Up To 48 HR Odor Protection | 1.46 |
| Right Guard | 017000068060 | Q631800729 | Unknown | Sport, Fresh, Up To 48 HR Odor Protection | 0.91 |

[11] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, Nov. 3, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (the "Valisure Petition"), at 1.

[12] *Id.* at 12-14.

[13] The first sample of the above chart has been confirmed by another laboratory at Yale University, which actually found benzene at 5.07 ppm. *See* Valisure Petition at 12-13.

15.     In addition, Valisure recommended that each of Defendants' Products tested above be recalled.  *See* Valisure Petition at 17 ("This Petition seeks to have the Commissioner and FDA request recalls for the identified batches of body spray products, consistent with FDA's mandate to ensure the safety of the drug supply in America. The 38 batches in Table 2 and Table 3 have significantly detected benzene and should be recalled.").

16.     Again, Valisure's test results have been confirmed by recalls of several antiperspirant products manufactured by Procter & Gamble, Helen of Troy, and Unilever, where benzene was detected by Valisure.

17.     The FDA does state that if the use of benzene is "**<u>unavoidable</u>** in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[14]   However, many of Defendants' Products that were tested contain levels of benzene above this amount.  Regardless, according to Valisure, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[15]   Accordingly, **<u>any</u>** level of benzene in Defendants' Products is unacceptable and therefore renders the Products adulterated, misbranded, unsafe, and worthless.

18.     Defendants did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, or in any advertising or website promoting the Products.  Defendants did not disclose the actual or potential presence of benzene in the Products to Plaintiffs or Class members at the point of sale or at any time before the point of sale.

---

[14] Valisure Petition at 1 (emphasis added).

[15] *Id.* at 1-2.

19.     In fact, Defendants misrepresented that Products did not contain benzene. Specifically, Defendants listed the active and inactive ingredients on the labeling of the Products, neither of which included benzene.



**Defendants Disregarded The Federal Good Manufacturing Practices Regulations**

20.     Antiperspirant body sprays are considered over-the-counter ("OTC") drugs that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.

21.     As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations

and the FDCA's state-law analogues.  Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[16]  21 C.F.R. 201.66 establishes labeling requirements for OTC products and defines an inactive ingredient as "any component other than an active ingredient."  An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans.  *The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form* intended to furnish the specified activity or effect."  (Emphasis added).

22.    21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."  In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

23.    The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211.  These detailed regulations set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K).

---

[16] https://www.fda.gov/media/72250/download.

The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

24.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States.  *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).  States have enacted laws adopting or mirroring these federal standards.

25.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess."  21 C.F.R. § 211.100.

26.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity."  21 C.F.R. § 211.160.

27.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested."  21 C.F.R. § 211.194.

28.     Defendants disregarded the cGMPs outlined above.  As a manufacturer, distributor, and seller of an OTC drug product, Defendants had and have a duty to ensure that its Products do not contain excessive (or any) levels of benzene, including through regular testing.  But based on Valisure's testing results set forth above, Defendants made no effort to test its Products for benzene

or other impurities and/or did not test the Products in accordance with cGMPs, as Defendants were required to do. Nor did Defendants disclose to Plaintiffs or any other consumers in any product advertising, labeling, packaging, or marketing that their antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendants represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

29. If Defendants had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendants would have identified the presence of the benzene contaminant almost immediately.

30. Further, had Defendants adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, they would have discovered that their Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

31. Accordingly, Defendants knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

32. Defendants also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

33. The presence of benzene—and Defendants' failure to comply with cGMPs— renders the Products both adulterated and misbranded under the FDCA.

34.     The Products are misbranded because their labeling is "false" and "misleading" because they do not disclose the presence of benzene.  21 U.S.C. § 352(a)(1).

35.     Under federal law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

### Plaintiffs and Class Members Have Been Injured

36.     When Plaintiffs purchased Defendants' Products, Plaintiffs did not know, and had no reason to know, that Defendants' Products were adulterated and misbranded and thus unlawful to sell or purchase as set forth herein.  Not only would Plaintiffs not have purchased Defendants' Products at all had they known the Products contained benzene, they would not have been capable of purchasing them if Defendants had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities.

37.     Moreover, no reasonable consumer would have paid any amount for medical products containing benzene, a known carcinogen and reproductive toxin.  Indeed, although benzene is found in gasoline, consumers are not spraying gasoline on their bodies like the Products here, and the levels of benzene present here (as much as 5 ppm) is *ten times higher* than the amount of benzene found in gasoline (0.5 ppm).  Further, unlike other products, benzene is *not supposed to be* in the Products and was not disclosed to consumers.

38.     Thus, if Plaintiffs and Class members had been informed that Defendants' Products contained benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

39.     Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene,

and Defendants have failed to warn consumers of this fact.  Such illegally sold products are worthless and have no value.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by his contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure.  Put differently, contaminated drugs, even if medically efficacious for his purpose, cannot create a benefit of the bargain because the contaminants, and his dangerous effects, were never bargained for.").

40.    Plaintiffs and Class members bargained for an antiperspirant product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendants sold them products containing benzene, which rendered the Products unmerchantable and unfit for use.

41.    Plaintiffs also would not have paid nearly as much for the Products if they had known they had benzene or even risked containing benzene.

42.    Plaintiffs and Class members are further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

## **PARTIES**

43.    Plaintiff Jason Goldstein is a resident of Delray Beach, Florida and has an intent to remain there, and is therefore a domiciliary of Florida.  In or about July 2021, Mr. Goldstein purchased a canister of Defendants' Right Guard Sport, Fresh, Up To 48 HR Odor Protection from both a CVS and a Publix supermarket in Florida.  Mr. Goldstein has been purchasing the same

Right Guard Products intermittently for the past year.  When purchasing the Right Guard Products, Mr. Goldstein reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Mr. Goldstein relied on these representations and warranties in deciding to purchase the Right Guard Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Right Guard Products from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and illegal to sell.  Mr. Goldstein's Right Guard Products were contaminated with benzene, therefore rendering them improperly manufactured, defective, not safe for their intended use, adulterated and misbranded, and illegal to sell.

44.     Plaintiff Brad Davis is a resident of Georgia and has an intent to remain there, and is therefore a domiciliary of Georgia. For at least the last six years, Mr. Davis made numerous purchases of Right Guard aerosol antiperspirant, including most recently in November 2021.  Mr. Davis purchased the Products from Walmart and Publix retail stores located in Cumming, Georgia. When purchasing the Right Guard Products, Mr. Davis reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Mr. Davis relied on these representations and warranties in deciding to purchase the Right Guard Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Right Guard Products from Defendants if he had known that they were not, in fact,

properly manufactured, free from defects, safe for their intended use, adulterated and misbranded, and illegal to sell.  Mr. Davis's Right Guard Products were contaminated with benzene, therefore rendering them improperly manufactured, defective, not safe for their intended use, adulterated and misbranded, and illegal to sell.

45.     Plaintiff Maria Lazo is a resident of New York and has an intent to remain there, and is therefore a domiciliary of New York.  During the applicable statute of limitations period, Plaintiff purchased Defendants' Products that contained benzene, including Right Guard – Sport, Fresh, Up To 48 HR Odor Protection and Right Guard – Sport, Powder Dry, Up To 48 HR Odor Protection. When purchasing the Right Guard Products, Ms. Lazo reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Ms. Lazo relied on these representations and warranties in deciding to purchase the Right Guard Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Right Guard Products from Defendants if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, adulterated and misbranded, and illegal to sell.  Ms. Lazo's Right Guard Products were contaminated with benzene, therefore rendering them improperly manufactured, defective, not safe for their intended use, adulterated and misbranded, and illegal to sell.

46.     Plaintiff Mosanthony Wilson is a resident of California and has an intent to remain there, and is therefore a domiciliary of California. Plaintiff Wilson has purchased Right Guard Sport Fresh aerosol antiperspirant regularly for approximately four years, typically once or twice each month.  The last time Plaintiff Wilson purchased the Product was in or around October 2021.

14

Plaintiff Wilson purchased the Product at Walmart in San Diego, California. When purchasing the Right Guard Products, Mr. Wilson reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Mr. Wilson relied on these representations and warranties in deciding to purchase the Right Guard Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Right Guard Products from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, adulterated and misbranded, and illegal to sell.  Mr. Wilson's Right Guard Products were contaminated with benzene, therefore rendering them improperly manufactured, defective, not safe for their intended use, adulterated and misbranded, and illegal to sell.

47.     Plaintiff James Corsey is a resident of New York and has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff Corsey has purchased Right Guard Sport Fresh regularly for many years, typically a few times each year.  The last time Plaintiff Corsey purchased the Product was in or around February 2021.  Plaintiff Corsey typically purchased the Products at Price Chopper in Rensselaer, New York or Walmart in East Greenbush, New York. When purchasing the Right Guard Products, Mr. Corsey reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Right Guard Products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell.  Mr. Corsey relied on these representations and warranties in deciding to purchase the Right Guard Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have

purchased the Right Guard Products from Defendants if he had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, adulterated and misbranded, and illegal to sell.  Mr. Corsey's Right Guard Products were contaminated with benzene, therefore rendering them improperly manufactured, defective, not safe for their intended use, adulterated and misbranded, and illegal to sell.

48.     Defendant Henkel Corporation is a Delaware corporation with its headquarters at One Henkel Way, Rocky Hill, Connecticut 06067.  Between 2006 and June 2021, Defendant Henkel distributed the Products throughout the United States.  The Right Guard Products, including the adulterated Products purchased by Plaintiffs and members of the putative Classes, are available at retail stores throughout the United States.

49.     Defendant Thriving Brands LLC is a limited liability company with its headquarters at 8170 Corporate Park Drive Suite 143, Cincinnati, Ohio 45242.  Since June 2021, Defendant Thriving Brands has distributed the Products throughout the United States.  The Right Guard Products, including the adulterated Products purchased by Plaintiffs and members of the putative Classes, are available at retail stores throughout the United States.

## JURISIDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than at least one Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

51.     Defendant Thriving Brands is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant is therefore "a citizen of the

State where it has its principal place of business [Ohio] and the State under whose laws it is organized." *See* 28 U.S.C. § 1332(d)(10).

52.     This Court has personal jurisdiction over Defendants because Defendant Henkel is headquartered in this District, which subjects it to general personal jurisdiction for all claims. Defendants have also agreed to waive all arguments concerning personal jurisdiction but otherwise reserve all other rights, defenses, and arguments.[17]

53.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here, Defendant Henkel resides here, and Defendants have also agreed to waive all arguments concerning venue, but otherwise reserve all other rights, defenses, and arguments.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class").

55.     Plaintiff Goldstein also seeks to represent a subclass of all Class members who purchased the Products in Florida (the " Florida Subclass").

56.     Plaintiffs Lazo and Corsey also seek to represent a subclass of all Class members who purchased the Products in New York (the "New York Subclass").

57.     Plaintiff Davis also seeks to represent a subclass of all Class members who purchased the Products in Georgia (the "Georgia Subclass").

---

[17] *See Wilson et al. v. Thriving Brands LLC et al*, Case No. 3:21-cv-01988-H-RBB (S.D. Cal) at ECF Dkt. 11, which was granted by the court. Regarding the transfer " Defendants have agreed to waive all arguments concerning personal jurisdiction and venue, but otherwise reserve all other rights, defenses, and arguments."); *see also Davis v. Thriving Brands LLC et al.,* Case No: 3:22-cv-00196-AWT (D.Conn.) at ECF Doc 7. Judge Black's transfer order noted that "[HENKEL CORPORATION and THRIVING BRANDS LLC, ] have waived all arguments concerning personal jurisdiction and venue…"

58.     Plaintiffs Wilson also seeks to represent a subclass of all Class members who purchased the Products in California (the "California Subclass").

59.     The Class and Subclasses are collectively referred to as the "Classes."

60.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

61.     Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

62.     **Numerosity.** The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiffs, the true number of members of the Classes are known by Defendants.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

63.     **Typicality.**  The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.   The representative Plaintiffs, like all members of the Classes, have been

damaged by Defendants' misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

64.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.   These common legal and factual questions include, but are not limited to, the following:

> (a)   whether the Products manufactured by Defendants contain benzene, thereby breaching the express and implied warranties made by Defendants and making the Products unfit for human use and therefore unfit for their intended purpose;

> (b)   whether Defendants knew or should have known the Products contained elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

> (c)   whether Defendants are liable to Plaintiffs and the Class for unjust enrichment;

> (d)   whether Defendants are liable to Plaintiff and the Class for fraud;

> (e)   whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

> (f)   whether Plaintiff and the Classes are entitled to declaratory and injunctive relief;

> (g)   whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendants; and

(h)   whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

65.   **Adequacy of Representation.**   Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are antagonistic to those of the Classes.

66.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

67.   In the alternative, the Classes may be certified because:

(a)   the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

(b)   the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of

other members of the Classes not parties to the adjudications, or substantially impair or impede his ability to protect his interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT 1
### Breach Of Express Warranty
### (On Behalf of Plaintiffs and the Class)

68.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     In connection with the sale of the Products, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers issued written warranties by representing that the Products were body sprays that contained only those active and inactive ingredients listed on the Products' labels. Those active and inactive ingredients do not include benzene, a known human carcinogen.

70.     Defendants also provided Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing the Products are body spray antiperspirants, rather than adulterated body sprays containing dangerous chemicals.

71.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

72.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class Members' transactions.

73.     Plaintiffs and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

74.     Defendants knowingly breached the express warranties by including benzene in the Products sold to Plaintiff and the Class without properly notifying them of its inclusion in the Products.

75.     Within a reasonable time after they knew or should have known, Defendants did not change the Products' labels to include benzene in the ingredient list.

76.     Defendants thereby breached the following state warranty laws:

    a.      Code of Ala. § 7-2-313;

    b.      Alaska Stat. § 45.02.313;

    c.      A.R.S. § 47-2313;

    d.      A.C.A. § 4-2-313;

    e.      Cal. Comm. Code § 2313;

    f.      Colo. Rev. Stat. § 4-2-313;

    g.      Conn. Gen. Stat. § 42a-2-313;

    h.      6 Del. C. § 2-313;

    i.      D.C. Code § 28:2-313;

    j.      Fla. Stat. § 672.313;

    k.      O.C.G.A. § 11-2-313;

    l.      H.R.S. § 490:2-313;

    m.      Idaho Code § 28-2-313;

    n.      810 I.L.C.S. 5/2-313;

o.  Ind. Code § 26-1-2-313;

p.  Iowa Code § 554.2313;

q.  K.S.A. § 84-2-313;

r.  K.R.S. § 355.2-313;

s.  11 M.R.S. § 2-313;

t.  Md. Commercial Law Code Ann. § 2-313;

u.  106 Mass. Gen. Laws Ann. § 2-313;

v.  M.C.L.S. § 440.2313;

w.  Minn. Stat. § 336.2-313;

x.  Miss. Code Ann. § 75-2-313;

y.  R.S. Mo. § 400.2-313;

z.  Mont. Code Anno. § 30-2-313;

aa.  Neb. Rev. Stat. § 2-313;

bb.  Nev. Rev. Stat. Ann. § 104.2313;

cc.  R.S.A. 382-A:2-313;

dd.  N.J. Stat. Ann. § 12A:2-313;

ee.  N.M. Stat. Ann. § 55-2-313;

ff.  N.Y. U.C.C. Law § 2-313;

gg.  N.C. Gen. Stat. § 25-2-313;

hh.  N.D. Cent. Code § 41-02-30;

ii.  II. O.R.C. Ann. § 1302.26;

jj.  12A Okl. St. § 2-313;

kk.  Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.     Wyo. Stat. § 34.1-2-313.

77.     Defendants received direct, mailed notice from individuals related to the claims at issue in this Consolidated Amended Complaint, and specifically Defendants' breaches of its warranties. Plaintiff Goldstein mailed a notice letter on November 19, 2021, Plaintiff Mosanthony Wilson sent a notice letter on November 23, 2021, and Plaintiff Davis sent a notice letter on December 14, 2021.   Specifically, as of November 19, 2021 direct notice was sent to Defendants to inform it of its breaches of express and implied warranties by Plaintiffs. These notice letters provided notice of Defendants' breach and demanded that Defendants correct or rectify the breach complained of herein.

78.     Furthermore, affording Defendants an opportunity to cure its breach of warranties would be unnecessary and futile here. Defendants were placed on reasonable notice of the defect

in the Products and breach of the warranties by the Valisure Report. Accordingly, Defendants had had ample opportunity to cure the defect for Plaintiffs and Class but has failed to do so.

79.     Defendant also has notice of its breach as set forth herein by virtue of the news reports surrounding this subject.

80.     As a direct and proximate result of Defendants' breaches of its express warranty and failure of Defendants' Products to conform to its representations as warranted, Plaintiff and Class Members have been damaged in that they did not receive the product as specifically warranted and/or purchased a product that they otherwise would not have purchased (or paid a premium for) if they knew it did not conform to Defendants' warranties.

**COUNT 2**
**Breach Of Implied Warranty of Merchantability**
**(On Behalf of Plaintiffs and the Class)**

81.     Plaintiffs repeat and re-allege all previous paragraphs as if fully included herein.

82.     Defendants sold and Plaintiff and Class Members purchased the Products.

83.     When sold by Defendants, the Products were not merchantable, did not pass without objection in the trade under the label description, were not of adequate quality within that description, were not fit for the ordinary purposes for which such goods are used, and did not conform to the promises or affirmations of fact made on their container or label.

84.     Because the Products contain benzene, they are in no way were safe for use as antiperspirant products.

85.     Defendants received direct, mailed notice from individuals related to the claims at issue in this Consolidated Amended Complaint, and specifically Defendants' breaches of its warranties. Plaintiff Goldstein mailed a notice letter on November 19, 2021, Plaintiff Mosanthony Wilson sent a notice letter on November 23, 2021, and Plaintiff Davis sent a notice letter on

25

December 14, 2021.   Specifically, as of November 19, 2021 direct notice was sent to Defendants to inform it of its breaches of express and implied warranties by Plaintiffs. These notice letters provided notice of Defendants' breach and demanded that Defendants correct or rectify the breach complained of herein.

86.     Furthermore, affording Defendants an opportunity to cure its breach of warranties would be unnecessary and futile here. Defendants were placed on reasonable notice of the defect in the Products and breach of the warranties by the Valisure Report. Accordingly, Defendants had had ample opportunity to cure the defect for Plaintiffs and Class but has failed to do so.

87.     Defendant also has notice of its breach as set forth herein by virtue of the news reports surrounding this subject.

88.     As a direct result of Defendants' Products being unfit for intended purpose and/or otherwise not merchantable, Plaintiff and Class members were damaged because they would not have purchased Defendants' Products had they known the true facts regarding the benzene content.

### COUNT 3
**Fraudulent Concealment**
**(On Behalf of Plaintiffs and the Class)**

89.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     Defendants concealed and failed to disclose on the Products' packaging and labeling the material fact that the Products contained benzene, and that the Products were not safe for their intended use.

91.     Further, Defendants misrepresented that the Products did not contain benzene via their active and inactive ingredient labeling when, in fact, the Products did contain benzene.

92.     Defendants had knowledge that the Products contained benzene, and that the Products were not safe for their intended use.

93.     Defendants had a duty to disclose that the Products contained benzene, and that the Products were not safe for their intended use.

94.     Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiff and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their Products.  Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains benzene, especially at the point of sale.

95.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiff and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.  Defendants know that if they had not omitted that the Products contained benzene, then Plaintiff and the Class would not have purchased the Products at all (or paid nearly as much for them); however, Defendants wanted to increase sales and profits.

96.     Defendants' concealment misled Plaintiff and the Class as to the true nature of what they were buying and putting onto and into their bodies.

97.     Defendants fraudulently concealed that the Products contained benzene and that the Products were not safe for their intended use.  Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT 4
### Medical Monitoring
### (On Behalf of Plaintiff and the Class)

98.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     As a result of Defendants' negligence, Plaintiff and Class Members have been exposed to the carcinogen benzene.

100.    As a proximate result of Plaintiff and Class Members' exposure to benzene, Plaintiff and Class Members have a significantly increased risk of serious medical complications, including ailments such as bone marrow harm and blood cancer (such as leukemia).

101.    A monitoring procedure exists that makes the early detection of these types of ailments possible.

102.    The prescribed monitoring program is reasonably necessary according to contemporary scientific principles.

103.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the health and rights of Plaintiff and Class Members.

## COUNT 5
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class in the Alternative)

104.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    Defendants' conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

28

106.    Defendants' unlawful conduct, as described in this Complaint, allowed Defendants to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class Members and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

107.    Plaintiffs and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Products, which were not as Defendants represented them to be.

108.    It is inequitable for Defendants to retain the benefits conferred by Plaintiffs' and Class Members' overpayments.

109.    Plaintiffs and Class Members seek establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

**<u>COUNT 6</u>**
**Violation Of The Florida Deceptive And Unfair Trade Practices Act,**
**Fla. Sta. §§ 501.201, *et seq.***
**(On Behalf of Plaintiff Goldstein and the Florida Subclass)**

110.    Plaintiff Goldstein incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-67 above as though fully set forth herein.

111.    The Florida Deceptive And Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

112.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

113.    FDUPTA can be violated in two ways, both of which are relevant to this case.  First, Defendants have committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiff and members of the Subclass.

114.    Second, Defendants have committed a per se violation of FDUPTA predicated on a violation of the FDCA.  Specifically, by selling adulterated and misbranded Products which is per se illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, and because the FDCA is designed to protect consumers from harmful and dangerous drugs, Defendants have committed per se violations of FDUPTA.  Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

115.    While FDUPTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).  Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers*." Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

116.     Defendants engaged in conduct that is likely to deceive members of the public. This conduct includes representing that the Products contained only the ingredients listed in the label, which is untrue, and failing to make any mention that the Products contained harmful levels of benzene and were adulterated and misbranded.

117.     As alleged herein, Plaintiff Goldstein and the Florida Subclass have suffered injury in fact and lost money as a result of Defendants' conduct because they purchased the Products from Defendants in reliance on Defendants' representations that the Products were safe and effective and not contaminated with benzene, as well as Defendants' material omissions regarding the true nature of the Products.

118.     As alleged herein, Defendants' actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Goldstein and the Florida Subclass to damages and relief under the statute.

119.     By committing the acts alleged above, Defendants engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

120.     Defendants' conduct is substantially injurious to consumers. Consumers are purchasing and using Defendants' Products without knowledge that the Products are adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Products, which are contaminated with benzene, but for Defendants' false labeling, advertising, promotion, and material omissions. Thus, Plaintiff Goldstein and the Florida Subclass have been "aggrieved" (i.e., lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

121.     Indeed, no benefit to consumers or competition results from Defendants' conduct. Because consumers reasonably rely on Defendants' representation of the ingredients contained on Products' label and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

122.     Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.  Plaintiff Goldstein desires to purchase Defendants' Products in the future if he can be assured that the Products are not adulterated or misbranded and meet the advertising claims on the Products' label.

**COUNT 7**
**Violation Of Georgia's Fair Business Practices Act**
**GA. Code Ann. § 10-1-390, *et seq*.**
**(On behalf of Plaintiff Davis and the Georgia Subclass)**

123.     Plaintiff Davis hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

124.     Plaintiff Davis and Georgia Subclass members are "consumers," as defined by GA. Code Ann. § 10-1-392(a)(6).

125.     Defendants' conduct as alleged herein related to "trade and commerce" for "goods" and "services", as defined by GA. Code Ann. § 10-1-392(a)(28).

126.     Defendants advertised, offered, or sold goods or services in Georgia and engaged in trade or commerce directly or indirectly affecting the people of Georgia.

127.     Defendants engaged in unfair and deceptive acts or practices, in violation of GA. Code Ann. § 10-1-393(a), as described herein.

128.     Defendants intended to mislead Plaintiff Davis and Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

129.     Defendants' representations and omissions were material because they were likely

32

to deceive reasonable consumers.

130.   Under the circumstances, consumers had a reasonable interpretation of Defendants'
representations and omissions.

131.   Defendants had a duty to disclose material facts to consumers, including but not
limited to, that the Products containing benzene, a known human carcinogen, and are unsafe for
use. These material facts should have been disclosed because they were contrary to Defendants'
representations about the Products.

132.   Defendants' acts and practices caused or were likely to cause substantial injuries to
consumers, which were not reasonably avoidable by consumers themselves and not outweighed
by countervailing benefits to consumers or to competition.

133.   The injury to consumers was and is substantial because it was non-trivial and
nonspeculative, and involved a concrete monetary injury. The injury to consumers was substantial
not only because it inflicted harm on a significant and unprecedented number of consumers, but
also because it inflicted a significant amount of harm on each consumer.

134.   Consumers could not have reasonably avoided injury because Defendants' business
acts and practices unreasonably created or took advantage of an obstacle to the free exercise of
consumer decision-making. By withholding important information from consumers, Defendants
created an asymmetry of information between it and consumers that precluded consumers from
taking action to avoid or mitigate injury.

135.   Defendants' business practices had no countervailing benefit to consumers or to
competition.

136.   Defendants are presumed, as a matter of law under GA. Code Ann. § 10-1-392(b),
to have intentionally violated the Georgia Fair Business Practices Act because it knowingly sold

goods or services in the manner and of the nature advertised or offered in violation of this statute.

137.    Defendants acted intentionally, knowingly, and maliciously to violate Georgia's Fair Business Practices Act, and recklessly disregarded Plaintiff's and Georgia Subclass members' rights.

138.    As a direct and proximate cause of Defendants' deceptive acts and practices, Plaintiff Davis and the Georgia Subclass members have been injured and harmed because they would not have purchased the Products on the same terms if they knew the true facts regarding the benzene content.

**COUNT 8**
**Violation Of Georgia's Uniform Deceptive Trade Practices Act**
**GA. Code Ann. § 10-1-370 *et seq*.**
**(On behalf of Plaintiff Davis and the Georgia Subclass)**

139.    Plaintiff Davis hereby incorporates all other paragraphs of this Complaint and restates them as if fully set forth herein.

140.    Defendants are "person[s]" as defined by GA. Code Ann. § 10-1-371(5).

141.    Defendants advertised and sold the Products in Georgia and engaged in trade or commerce directly or indirectly affecting the people of Georgia.

142.    Defendants engaged in unfair and deceptive acts or practices, in violation of GA. Code Ann. § 10-1-372(a)(5), (7), (9), and (12) as described herein.

143.    Defendants failed to disclose material facts to consumers in advertising and on the Product labels, including but not limited to, that the Products contain benzene, a known human carcinogen, and are unsafe for use. The labels for the Products did not warn consumers that benzene was present, and that as a result, the Products were of a particular standard, quality, or grade when they were of another.

144.    Additionally, Defendants failed to disclose that the Products contained benzene,

and therefore advertised the products with intent not to sell them as advertised. This conduct created a likelihood of confusion or of misunderstanding.

145.    Defendants knew or should have known that its conduct violated Georgia's Uniform Deceptive Trade Practices Act.

146.    Defendants had a duty to disclose material facts to consumers, including but not limited to, that the Products contain benzene and are unsafe for use. These material facts should have been disclosed because they were contrary to Defendants' representations about the Products.

147.    Defendants acted intentionally, knowingly, and maliciously to violate Georgia's Fair Business Practices Act, and recklessly disregarded Plaintiff's and Georgia Subclass members' rights.

148.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendants created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

149.    As a direct and proximate cause of Defendants' deceptive acts and practices, Plaintiff Davis and the Georgia Subclass members have been injured and harmed because they would not have purchased the Products on the same terms if they knew the true facts regarding the benzene content.

### COUNT 9
### Violation Of New York GBL § 349
### (On Behalf of Plaintiffs Lazo, Corsey, and the New York Subclass)

150.    Plaintiffs Lazo and Corsey repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

151.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

152.    By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Products (i) would not contain dangerously high levels of benzene, and (ii) are generally recognized as safe for human use.  Defendants also materially omitted key facts regarding the true nature of the Products, specifically that the Products contained dangerous levels of benzene, were adulterated, and were unsafe for use as an antiperspirant.  Had Plaintiffs Lazo, Corsey, and members of the New York Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Products or paid a lot less for them.

153.    The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiffs Lazo and Corsey and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

154.    There is no adequate remedy at law.

155.    Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

156.    Defendants' improper consumer-oriented conduct—including misrepresenting and/or failing to disclose that the Products have benzene—is misleading in a material way in that it, *inter alia*, induced Plaintiffs Lazo and Corsey and the New York Subclass Members to purchase Defendants' Products and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless

disregard for the truth.

157.    Plaintiffs Lazo and Corsey and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless. Plaintiffs Lazo and Corsey and the New York Subclass Members also received substantially less than what they bargained and paid for

158.    Defendants' advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

159.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

160.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs Lazo and Corsey and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT 10**
**Violation Of New York GBL § 350**
**(On Behalf of Plaintiffs Lazo, Corsey, and the New York Subclass)**

161.    Plaintiff Lazo and Corsey repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

162.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

163.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

164.    Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning their Products inasmuch as they misrepresent that the Products are safe for use and do not list that the Products contain benzene.

165.    Plaintiff Lazo and Corsey and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless.  Plaintiff Lazo and Corsey and the New York Subclass Members also received substantially less than what they bargained and paid for.

166.    Defendants' advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

167.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

168.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

169.    Defendants made the material misrepresentations described in this Complaint in their advertising and on the Products' packaging and labeling.

170.    Defendants' material misrepresentations were substantially uniform in content,

presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

171.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs Lazo and Corsey and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT 11**
**Violation Of California's Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff Wilson and the California Subclass)**

172.    Plaintiff Wilson repeats and re-alleges the allegations above as if set forth herein.

173.    Defendants' conduct constitutes violations under California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"). The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

174.    Defendants' conduct falls within the meaning of this statute because they caused transactions to occur resulting in the sale or lease of goods or services to consumers – namely, the sale of the Products to Plaintiff Wilson and the California Subclass. Deodorant and antiperspirant sprays are considered goods within the meaning of the statute under Civil Code § 1761(a) and Defendants' sale of the Products are considered a service under Civil Code § 1761(b).

175.    Plaintiff Wilson and Class Members are consumers pursuant to the CLRA.

176.    Defendants violated the CLRA by way of the following provisions:

- In violation of Civil Code § 1770(a)(5), Defendants represented (and continue to represent) that their goods have characteristics which they do not have – that, in exchange for each payment, Plaintiff Wilson and the members of the California

Subclass receive antiperspirant which is functioning as intended and which is not contaminated with benzene;

- In violation of Civil Code § 1770(a)(14), Defendants represented (and continue to represent) that a consumer has rights, remedies and/or obligations which they did not have – that Plaintiff Wilson and members of the California Subclass receive antiperspirant which is functioning as intended and which is not contaminated with benzene, and that Defendants are capable of correcting defects when they are not;

177. Defendants also engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code § 1770(a)(5) and (a)(7) when they represented through their advertising, warranties, and other express representations that the Products have benefits or characteristics that they did not actually have, namely that the Products were safe to use and failing to disclose that the Products were contaminated with the carcinogen benzene.

178. Defendants are aware that their representations are false and misleading – specifically, the Defendants continue to sell the Products into the stream of commerce even after they had knowledge that the Products were contaminated with benzene.

179. Plaintiff Wilson and California Subclass have suffered injury-in-fact and actual damages resulting from Defendants' omissions and misrepresentations because Defendants knew that the Product was contaminated with benzene.

180. On November 24, 2021, prior to the filing of this Complaint, Plaintiff Wilson and Class Members put Defendants on written notice of their claims arising from violations of numerous provisions of California law, including the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770, *et seq.*, as well as other causes of action. Plaintiff Wilson will amend his Complaint to add claims for monetary damages if Defendants fail to take the

corrective actions.

181.    In accordance with Civil Code § 1780(a), Plaintiff Wilson and the other California Subclass Members seek injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendants from continuing their deceptive advertising and sales practices.

182.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Wilson seeks an order enjoining Defendants from the unlawful practices described above, a declaration that Defendants' conduct violates the Consumers Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

183.    Plaintiff Wilson and the California Subclass Members' injuries were proximately caused by Defendants' fraudulent business practices.

184.    Therefore, Plaintiff Wilson and California Subclass Members are entitled to relief under the CLRA.

## <u>COUNT 12</u>
### Violation Of California's False Advertising Law
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### (On Behalf of Plaintiff Wilson and the California Subclass)

185.    Plaintiff Wilson repeats and re-alleges the allegations above as if set forth herein.

186.    California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

41

187.    Defendants advertised and promoted the Products by relying on the trust and brand loyalty customers had for their Right Guard brand and representing that the Products were safe for personal use, when in reality the Products were contaminated with benzene.   Defendants' advertisements and inducements were made in and originated from California and fall within the definition of advertising as contained in Bus. & Prof. Code § 17500, *et seq.* in that Defendants' representations were intended to induce consumers to purchase the Products. Defendants knew that those statements were false and misleading as it knew or should have known through the exercise of reasonable care that the Products were contaminated with benzene.

188.    Plaintiff Wilson and the California Subclass lost money or property as a result of Defendants' FAL violations because (a) they would not have purchased Defendants' Products absent Defendants' representations that the Products were safe and effective; (b) they would not have purchased the Products for the same price absent Defendants' misrepresentations; and (c) Defendants' Products did not have the characteristics, benefits, or quantities as promised.

### COUNT 13
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Wilson and the California Subclass)**

189.    Plaintiff Wilson repeats and re-alleges the allegations above as if set forth herein.

190.    Defendants engaged in unlawful, fraudulent, and unfair business practices.

191.    Defendants' conduct was unlawful because it violates the CLRA, the FAL, tort law, and contract law.

192.    Defendants' conduct is fraudulent because they continued to represent that their goods were fit for their intended use when they knew that the Products were contaminated with benzene in an attempt to get consumers to continue to buy the Products; and, Defendants' conduct is fraudulent because they did not disclose to the buyers that the Products were contaminated with

benzene and continue to conceal the fact of this contamination in an attempt to keep consumers from seeking refunds or seeking other redress, so they would not bear the costs of the defect and any damage it may have caused.

193.    Defendants' conduct constitutes an unfair business practice under the California Unfair Competition Law ("UCL"). A business practice is considered to be "unfair" if the conduct alleged is immoral, unethical, oppressive, or substantially injurious to consumers; as well as if the conduct causing alleged injury which is not outweighed by benefits to other consumers or to competition, and that the injury is of a type which the consumer could not have avoided.

194.    Defendants' behavior is immoral, unethical, oppressive, and injurious to consumers because they are profiting from concealing the presence of benzene in the Product, which is still being sold to this day.

195.    Defendants' retention of profits from the aforementioned conduct does not outweigh the economic harm that said retention imposes on consumers. The lone party that benefits is the Defendants – their conduct also harms competition, who would otherwise be the recipient of the business that Defendants acquired using omissions and misrepresentations.

196.    Plaintiff Wilson and the California Subclass Members had no way of knowing that Defendants were selling defective products.

197.    Therefore, Plaintiff Wilson and the California Subclass Members are entitled to relief under the UCL.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives for the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)     For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: April 4, 2022                    Respectfully submitted,

**REARDON SCANLON LLP**

By: */s/ James J. Reardon, Jr.*
       James J. Reardon, Jr.

James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

*Interim Liaison Counsel*

44

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice*)
701 Brickell Ave, Suite 1420
Miami FL, 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell (*pro hac vice*)
Max S. Roberts (*pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: aobergfell@bursor.com
           mroberts@bursor.com

**THE SULTZER LAW GROUP, P.C.**
Jason P. Sultzer, Esq. (*pro hac vice*)
Joseph Lipari, Esq. (*pro hac vice*)
Daniel Markowitz, Esq. (*pro hac vice*)
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

**LEVIN SEDRAN & BERMAN LLP**
David C. Magagna Jr., Esq. (*pro hac vice*)
Charles E. Schaffer, Esq. (*pro hac vice*)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Nick Suciu, III, Esq.*
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.: (313) 303-3472
Fax: (865) 522-0049

E-Mail: nsuciu@milberg.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
Jennifer Czeisler, Esq.*
Virginia Ann Whitener, Esq.*
Russell Busch, Esq.*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: (865) 247-0080
Fax: (865) 522-0049
E-Mail: jczeisler@milberg.com
          gwhitener@milberg.com
          rbusch@milberg.com

**LEVI & KORSINSKY LLP**
Mark S. Reich *(pro hac vice*)
Courtney E. Maccarone *(pro hac vice*)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
          cmaccarone@zlk.com

*Pro Hac Vice* Application Forthcoming

*Co-Lead Counsel for Plaintiffs and the Classes*